# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 1, 2008

## STATE OF TENNESSEE v. STEVEN DAVIS

### Direct Appeal from the Criminal Court for Shelby County
### No. 06-06628    Paula Skahan, Judge

### No. W2007-02165-CCA-R3-CD - Filed October 13, 2008

The defendant, Steven Davis, was convicted of one count of aggravated robbery, a Class B felony, and sentenced to ten years in confinement. On appeal, the defendant argues that the evidence was insufficient to sustain his conviction. Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Alan E. Glenn, JJ., joined.

Garland Ergüden (on appeal) and Constance Barnes (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Steven Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. BACKGROUND

The victim, Harry Bond, testified that on Saturday, November 19, 2005, at approximately 1:00 a.m., upon arriving at his parents' apartment from college and while exiting his car, he was approached by two men, one of whom had a pistol. He stated that he observed the two men briefly before turning and saying, "I don't see your face, please don't shoot." The victim told the men to take whatever they wanted. According to the victim, the man with the gun started to go through his pockets. The other man asked, "Where's the money at?" and instructed his partner to get all of the money. The victim continued to plead with the men, saying, "Please, I don't see your face. I don't see your face, please don't shoot[,] please don't shoot." The men took the victim's cell phone, wallet and car keys, hit the victim on the shoulder, and told him to run. The victim ran inside his parents' apartment and called the police. The men drove off in the victim's car.

The victim testified that he kept telling the men that he could not see their faces because he believed his chances of living through the ordeal would increase. The victim told police that he believed a third person may have also been involved in the robbery. According to the victim, he was able to get a good look at the suspects' faces. He described both suspects to police as young adult African American males. The victim further described the suspect with the pistol as about five-feet, seven inches tall, light-complected, with a red bubble coat and dark jeans. The second suspect was taller, approximately six feet tall, dark-complected with a green sweat suit hoodie and blue jeans. The second suspect wore a bandanna which only partially obscured his face.

The victim testified that after calling police, his father went outside and discovered that the victim's car, a silver Volvo, was gone. The victim gave police officers his license plate number. On Monday morning after the robbery, he received a call from police who notified him that his car had been recovered and that a suspect had been taken into custody. Police showed the victim photographic arrays of possible suspects. The victim was able to identify the man with the gun from the first photographic array he was shown. Later, the victim identified the defendant as the second man from a separate photographic array. The victim stated that the entire robbery only took about two minutes. He also stated that he was able to get a good look at the gun, a black .38 caliber revolver. The victim testified that police were only able to recover his car.

On cross-examination, the victim testified that the robbery occurred near a lit carport at his parents' apartment complex. He admitted that the time that elapsed from the moment the suspects walked up to him until he turned away was less than thirty seconds. On re-direct examination, the victim identified a photograph of the shorter, light-complected suspect as the man with the gun. The victim stated that the defendant was the man he identified to police as the taller suspect who wore a bandanna. He acknowledged that he signed and initialed a photograph of the defendant at the time he made his identification to police.

Deonne Mosley testified that she was the defendant's mother. She stated that she had just finished working two shifts as a nurse at Collierville Health and Rehab. When she arrived home early Monday morning, November 21, 2005, she observed a Volvo in her driveway. She entered the house and knocked on the defendant's bedroom door to speak to him about the car. According to Ms. Mosley, she heard the defendant, two other "boys", and three girls behind the door in the defendant's bedroom. Getting no response, Ms. Mosley kicked the bedroom door. All of the occupants except the defendant fled the house through the bedroom window. Ms. Mosley called the police. According to Ms. Mosley, the defendant remained with her at the house. She went to the door, yelled at the fleeing men, and told them not to hit her car. The men abandoned the stolen Volvo in her driveway and ran. Police officers arrived at Ms. Mosley's house approximately ten minutes after she called.

On cross-examination, Ms. Mosley testified that prior to the events early on Monday morning, November 21st, she spent the weekend moving. The defendant and his friends, Mario and Christopher Waller, helped her move over the course of the weekend. According to Ms. Mosley, on

2

Friday, November 18th, the men helped the Wallers' aunt, Sandra Jackson, move her belongings from her old apartment to a new one. Late Friday night, the men came to Ms. Mosley's house and remained. Ms. Mosley awoke at approximately 1:00 a.m. early on Saturday morning to go to the restroom. While up, she checked on the men who were all asleep in the defendant's bedroom. She stated that the men were all present on Saturday morning when she woke up. Ms. Mosley further stated that early Monday morning, November 21st, when she came home and discovered the Volvo in her driveway, the defendant was not in the car and did not have any keys to the car. She testified that she searched the defendant's room and did not recover any credit cards or other possessions belonging to the victim.

Sergeant Don Hopkins testified that he worked for the Memphis Police Department as an investigator in the Robbery Bureau. He stated that he generated photographic arrays of suspects for the victim to review. The victim was able to identify the defendant. Sergeant Hopkins also stated that he did not receive reports from any of the other police officers involved in the case indicating that Ms. Mosley made a statement that she saw the defendant asleep in his bedroom at the time of the robbery. On cross-examination, Sergeant Hopkins acknowledged that it was possible for Ms. Mosley to have spoken to a police officer or to have made an offhand remark to an officer that would not have been recorded on an incident report.

Officer Michael Sinnock of the Memphis Police Department testified that he was called to the scene of a disturbance at the Mosley home early Monday morning, November 21, 2005. When he arrived, Ms. Mosley was the only person present at the scene. He and his partner found the carjacked Volvo parked in the driveway. Officer Sinnock informed Ms. Mosley that the Volvo was involved in a carjacking. He stated that Ms. Mosley did not make any statement to him as to whether the defendant was at home at the time of the alleged incident. Officer Sinnock testified that the car was subsequently towed to the city's fingerprint laboratory. On cross-examination, Officer Sinnock stated that he did not tell Ms. Mosley exactly when the carjacking occurred. He did not observe Ms. Mosley make a statement to any other police officer about the defendant's presence at her home on the night of November 18th.

James Hill testified that he was a Latent Print Examiner for the Memphis Police Department. He stated that he examined the victim's car for latent fingerprints but was unable to find any fingerprints that matched the defendant's.

Sandra Jackson testified that on Saturday, November 19, 2005, four young men helped her move into her new apartment. Ms. Jackson stated that the defendant was one of the four men who helped her move, along with the defendant's brother, Brandon, and her nephews, Christopher and Mario Waller. Ms. Jackson could not recall how the men arrived at her house from their prior location. On cross-examination, Ms. Jackson confirmed that the men assisted her on Saturday, November 19, 2005. Ms. Jackson did not see the defendant until after lunch time on Saturday. She stated that on Friday night, November 18th, she and her husband stayed up until early Saturday morning to pack their belongings and did not see the defendant. Ms. Jackson testified that she had no idea where the defendant was at approximately 1:00 a.m. on Saturday morning.

Christopher Waller testified that he had known the defendant as a friend for four or five years.[1] He stated that he did not recall seeing the defendant on Friday, November 18, 2005. He confirmed that he was with the defendant the following day, Saturday, November 19th, when the defendant helped move Christopher's aunt, Sandra Jackson. After receiving a call from his aunt, he called his brother, Mario, and told him to come help. Mario, the defendant, and the defendant's brother, Brandon, all assisted with the move. According to Christopher, his uncle picked the four men up and later dropped them off at the defendant's house after they finished at around midnight. The four of them spent the night at the defendant's house Saturday night, watching movies and playing games until early Sunday morning. The four men were scheduled to help move the defendant's family on Sunday. Christopher did not see any possessions belonging to the victim, nor did he see a black revolver in the defendant's bedroom.

On cross-examination, Christopher testified that he could not recall when the four men went to his aunt's house to help her move, but he confirmed that the four men all arrived at his aunt's house sometime after lunch on Saturday. He was also unable to recall what he and the defendant did on Friday, November 18th.

Mario Waller testified that he was one of the four men who helped his aunt, Sandra Jackson, move on Saturday, November 19th. According to Mario, he spent Friday night with the defendant and his brother at the defendant's house, playing video games until going to sleep at around 3:00 or 4:00 a.m. When he awoke Saturday morning, he, his brother, the defendant, and the defendant's brother, Brandon, were still in the room together. Later that day, his uncle came to the house and picked them up. The four men began helping with the move sometime after lunch. They worked all day and returned to the defendant's house at around midnight. Once again, the men hung out watching movies and playing video games. The four men did not go to sleep until 4:00 a.m. Sunday morning. Mario testified that during that entire time, the defendant was present with the other men in the room. The next morning, Sunday, November 20th, the four men helped the defendant's family move. Mario stated that he did not see a black revolver in the defendant's room or a silver Volvo parked in the driveway. He stated that the defendant's mother was in the house Sunday morning when the men awoke.

On cross-examination, Mario testified that he spent three nights at the defendant's house; Friday night, Saturday night and Sunday night. He stated that at one point, the defendant's mother checked on them. Mario admitted that he did not tell anyone prior to trial that he was with the defendant during the time the defendant was alleged to have committed the robbery.

The jury found the defendant guilty and convicted him of aggravated robbery, a Class B felony. The defendant was sentenced to ten years in confinement as a standard, Range I offender and ordered to pay restitution to the victim. The defendant timely filed his appeal.

---

[1] Because brothers Christopher and Mario Waller both testified at trial, we will refer to them by their first names for the sake of clarity. No disrespect is intended to either witness.

4

# II. ANALYSIS

On appeal, the defendant argues that the evidence was not sufficient to support his conviction for aggravated robbery.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict, approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given to the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, the circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. at 613.

The defendant was convicted of aggravated robbery. Aggravated robbery is defined in part as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-401; - 402.

Viewing the evidence in a light most favorable to the state, it appears that the jury was provided with sufficient direct and circumstantial evidence to find the defendant guilty of the

5

charged offenses beyond a reasonable doubt. *See Winters*, 137 S.W.3d at 654. The victim in this case was able to positively identify the defendant as one of the two suspects who robbed him at gunpoint. The victim's car was recovered by police in the defendant's driveway. Questions were raised concerning the credibility and conflicting testimony of witnesses called at trial. Specifically, Christopher Waller, one of the witnesses who claimed to have been with the defendant that weekend, failed to offer any testimony regarding the defendant's whereabouts on November 18th-19th, the Friday night/Saturday morning of the robbery. Another witness, Mario Waller, testified that on the night of the robbery, he was with the defendant at his house playing video games. He later acknowledged that he failed to tell anyone about this potentially exculpatory information during the two-year period preceding the defendant's trial.

We note that there were inconsistencies in the testimony of the defendant's mother, Deonne Mosley. Ms. Mosley, recalled that on Friday, November 18th, the four men helped Sandra Jackson move before coming over to her house for the night. She stated that on the night of the robbery, she awoke at approximately 1:00 a.m. and checked on the defendant and his friends who were asleep in the defendant's bedroom. Her account conflicts with the testimony of Sandra Jackson and Christopher and Mario Waller, who each recalled that the men did not help Ms. Jackson move until Saturday afternoon, November 19th. Ms. Mosley's account specifically conflicted with Mario's testimony that the four men stayed up Friday night until approximately 4:00 a.m., watching movies and playing video games. Ms. Mosley testified that she checked on the men at around 1:00 a.m., the time of the robbery, and they were all asleep. Furthermore, Ms. Mosley claimed that she provided this information to one of the police officers who investigated the case. Jurors heard from police officers who testified that Ms. Mosley did not make the purported statement to any of them, and they were unable to corroborate Ms. Mosley's assertion that she had in fact made such a statement. In addition, Ms. Mosley testified that early on Monday morning, after she called police, the defendant remained at the house when police officers arrived to investigate. Officer Sinnock testified that upon arrival, he found the victim's car in the driveway, but did not see the defendant.

By their verdict, the jury accredited the testimony of the victim over the testimony of the defendant's mother and friends. Because the credibility of witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court, we will not disturb the jury verdict in this case. *See Bland*, 958 S.W.2d at 659. Circumstantial evidence supported an inference that the discovery of the victim's car at the defendant's house was related to the defendant's participation in the robbery. We reiterate that we are prohibited from replacing the jury's inferences drawn from the circumstantial evidence with our own. *See Reid*, 91 S.W.3d at 277. Furthermore, the identity of the defendant may be established by either direct evidence, circumstantial evidence, or a combination of the two. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). Identity is a question of fact for the jury to determine after consideration of all the evidence. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). It appears that the jury accredited the victim's positive identification of the defendant. Therefore,

we conclude that sufficient evidence existed to support the defendant's conviction for aggravated robbery. The defendant is without relief as to this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE